UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

SERVICE DRYWALL COMPANY, INC.                                        PLAINTIFF

v.                                                                 CIVIL ACTION NO. 3:06-CV-372-S

COMMONWEALTH WALLS, INC.,
WILLIAM CLAY LOCKE, JR.,
and ANTHONY G. STEIER                                            DEFENDANTS

## MEMORANDUM OPINION

After a jury found for Service Drywall Company and the court entered judgment against the defendants, the parties cross-appealed. The defense moved the court of appeals to remand the case with instructions to dismiss for lack of subject-matter jurisdiction. Service concedes that its complaint is defective in that it does not allege Service's citizenship for purposes of this court's diversity jurisdiction. The court of appeals declined to remand for dismissal, but did send the case back for the limited purpose of determining whether Service should be permitted to file an amended complaint curing the defective allegations.

The courts may permit amendments so as to repair defective jurisdictional allegations. 28 U.S.C. § 1653. And "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence." Fed. R. Civ. P. 15(b)(2). Such permission is to be freely granted, "so as to effectuate Congress' intent in enacting § 1653—to avoid dismissals on technical grounds." *Miller v. Davis*, 507 F.2d 308, 311 (6th Cir. 1974). The defendants argue that amendment should not be allowed in this case because there is insufficient evidence to support the proposition that Service is a citizen of Indiana (as the proposed amended complaint alleges). Service responds that yes in fact there was "a mountain of evidence that [Service's] one and only princpal place of business or headquarters was in Indianapolis." (Resp. 4.)

The Supreme Court has recently advised us that for purposes of 28 U.S.C. § 1332(c)(1), a corporation's "principal place of business" is its "nerve center": that is, "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1186 (2010). We are in agreement with the plaintiff that the evidence at trial overwhelmingly supported the conclusion that Indianapolis was Service's headquarters. The general theory of the case was that Service hired Clay Locke to establish a Louisville branch office, and that he committed various business torts against Service while he was in Kentucky and out of his employer's sight. All this only makes sense if Service's corporate eyes and ears were someplace other than Kentucky. And indeed there was extensive testimony from which one can draw the clear inference that Service's headquarters were in Indianapolis. To wit:

- Danny Roberts, president and sole owner of Service, testified:

  > I basically take care of the Indianapolis office. I take care of all of the—the financial end of the business. I take care of all of the bank lines, all the bank accounts, credit lines. The bonding company, I take care of that. I do a lot of work on the human resource end of it as far as our benefit packages.

  (1 Trial Tr. 8.) Thus the principal executive, financial, and managerial tasks take place in Indianapolis, where the owner and president keeps his primary office.

- Roberts later testified that he spends virtually every day in the Indianapolis office, and that he only visited Locke's Louisville branch office once every couple of weeks. (*Id.* at 31-32.)

- Roberts testified that when Service ultimately terminated Locke, "[w]e sent management down from Indianapolis to clean these jobs [i.e. those Locke had left unfinished in Louisville] up and get them done, get them off the books." (*Id.* at 62.) The management team, then, originated in Indianapolis.

- On cross-examination, Roberts explained the reasoning behind establishing a Louisville office:

  > Q. Okay. And there came a point in time, as I understand it, when you folks had bid on some jobs. You weren't getting the bids on the jobs, and you felt that maybe

that was because you didn't have a Louisville office, and you might have some better luck with somebody down here in Louisville as a physical presence. Is that essentially correct?

A. It's correct in a way. When we were bidding jobs in Louisville from the Indianapolis office, we were very sporadic. I mean, we would just hunt and peck and, oh, that looks like a nice job. We'll bid it. "Oh, that one looks like a pretty nice job. We'll throw a number at that and see if we can get somebody to bite on it."
   And no, we weren't having a lot of luck. But, you know, we—we also didn't concentrate on sending a person down to knock on doors, introduce ourself.

Q. And so you had the idea then—you and Mr. Vaughn [Roberts's second-in-command at Service] talked about it—maybe we need to open a Louisville office and we might do better. Am I right?

A. Correct.

(2 Trial Tr. 18-19.)

- Later cross-examination elicited the following exchange:

    Q. Mr. Roberts, at some point you had a personnel file dealing with Clay Locke, did you not?

    A. I'm sure.

    Q. What happened to that file?

    A. It may have been destroyed. We had a fire December—I think it was 12th, '05, totally destroyed our Indianapolis office. Our headquarters had lost a lot of documentation and I don't know.

    (*Id.* at 43-44.)

- And then this one:

    Q. . . . This Louisville office that was opened back in 2005 was the, at that time, the first and only attempt by your company to expand geographically; is that right?

    A. Away from our Indianapolis office, yes, to actually open an office in a different area.

    Q. The first time the company had ever opened a satellite office; right?

  A. Correct.

(*Id.* at 47.)

The court could go on ad nauseum. Suffice it to say that the trial testimony brought out ample evidence for the proposition that Service is headquartered in or around Indianapolis and always has been. There is moreover no evidence to the contrary, or to suggest that the firm's headquarters has ever been in Louisville or anyplace other than Indianapolis.

  Because the weight of the evidence is overwhelmingly in favor of proving the disputed jurisdictional fact, the motion to amend the complaint to allege Service's Indiana citizenship should be granted.

  The clerk is directed to transmit this opinion to the court of appeals.